Gwendolyn PHILLIPS, Administratrix of the ESTATE OF Robyn Jorjean WILLIAMS, Deceased, Gwendolyn Phillips, Administratrix of the Estate of Jerome I. Campbell, Deceased, Gwendolyn Phillips, Administratrix of the Estate of Alphonso Crawford, Deceased, Neil Curtis Williams, A Minor By His Guardian and Next Friend, Gwendolyn Phillips, Appellants,

v.

CRICKET LIGHTERS, Swedish Match, S.A., Pinkerton Tobacco Company, Pinkerton Group, Inc., Pinkerton Group, Inc., t/a d/b/a Cricket USA, Cricket S.A., Poppell, B.V., Wilkinson Sword/ Cricket Inc., Wilkinson Sword, Inc., NDC Corporation And National Development Corporation t/a Shenango Park Associates, DNC Asset Management Inc., Regional Sales Inc.,

---

Universal Match Company a/k/a Universal Match Corporation, Swedish Match A.B., Cricket B.V. Inter–Match S.A. Feudor, S.A. Schick Netherland, B.V. Warnerlambert Holland, B.V., Appellees,

Pennsylvania Trial Lawyers Association, Amicus,

Product Liability Advisory Council Inc., Amicus

Bic, Inc., A Pennsylvania Corporation, Amicus.

Superior Court of Pennsylvania.

Argued Oct. 3, 2000.

Filed April 10, 2001.

Reargument Denied June 22, 2001.

Henry Sewinsky, Sharon, for appellant.

Carl A. Eck and Louis Long, Pittsburgh, for Cricket Lighters, appellee.

Before HUDOCK, MUSMANNO and HESTER, JJ.

HESTER, J.

¶ 1 This personal injury action was instituted after a tragic fire killed single mother Robyn Williams and two of her three children, Jerome and Alphonso. The fire was started by a minor child playing with a disposable butane lighter that did not have child-resistant features. Appellant is Gwendolyn Phillips, who instituted this action in her capacity as administratrix of the estates of the decedents and also in her capacity as guardian of Neil, Robyn's sole surviving child. We find that the trial court improperly granted summary judgment to Appellees on the ground that Appellant cannot recover in this action due to the fact the product at issue was not used by an "intended user." We also reject Appellees' contention that federal consumer protection law preempts this action. We conclude that summary

judgment should not have been granted to the manufacturers and distributors of the disposable butane lighter used to start the fire under the risk-utility test applied in Pennsylvania to determine whether a product is defective. We reverse in part, affirm in part, and remand.

¶ 2 We first examine the deposition of Neil Williams, who witnessed the events at issue. During the night of November 30, 1993, Neil, who was five years old at the time, awoke in his apartment bedroom after hearing noises in the kitchen. He saw Jerome, then age two years and four months, with a lighter in his hand. Jerome had pulled a chair next to the refrigerator and had pulled down his mother's purse, which was located on top of the refrigerator. Neil tried unsuccessfully to awaken his sleeping mother. Neil then returned to his bedroom, where Jerome, still with the lighter, also was located. Jerome tried to light the lighter twice. His second effort was successful. The flame ignited the bed linens, and the room began to fill with smoke and fire. Neil unsuccessfully attempted to awaken his mother a second time. Neil then went to a window and started to scream. After suffering from smoke inhalation, he was rescued by a neighbor. The other three occupants of the apartment died. The record also establishes that the lighter was a Cricket disposable butane lighter, which was retrieved from the apartment following the fire.

¶ 3 This action was instituted against manufacturers and distributors of Cricket butane lighters, collectively referred to as Appellees, as well as against the owners and managers of the apartment complex where Robyn and her children lived ("NDC defendants"). Appellant set forth various causes of action against Appellees, and the gravamen of her claims rests on the fact that the lighter at issue did not have child-proof or child-resistant features. She alleged that the NDC defendants were negligent for failing to maintain smoke detectors located in the halls next to Robyn's apartment in an operable condition, failing to install smoke detectors in each room of the apartment, and failing to install wire smoke detectors rather than the battery-operated detectors present at the time of the fire. After summary judgment was granted to Appellees, Appellant negotiated a release with the NDC defendants, who are not involved in this appeal.

¶ 4 The following procedural facts also are pertinent. As noted, the complaint contained various causes of action against Appellees. After preliminary objections were granted, the remaining counts against Appellees were design-defect products liability, failure-to-warn products liability, breach of warranty, battery, negligence, negligent infliction of emotional distress, intentional infliction of emotional distress, and punitive damages. Appellees then were granted summary judgment on most of the claims based on the ground that the lighter was not defective because children are not intended users of Cricket butane lighters. The court also noted that a failure-to-warn products liability action was not viable since Appellees' documentation established that either the lighter itself or material in its packaging contained a warning, inter alia, to keep the lighter away from children. After finding the product was not defective on those grounds, the trial court then concluded that under Pennsylvania law, the fact that the product at issue was not defective was fatal to Appellant's breach of warranty claim, negligence claim, and negligent infliction of emotional distress claim. The court dismissed the punitive damages cause of action based on the conclusion that it was derivative to a viable cause of action, which Appellant no longer had. The court granted summary judgment to

Appellees and dismissed all the remaining counts in the complaint. This timely appeal followed entry of the final order in this action, which related to dismissal of the NDC defendants.[1]

¶ 5 Initially, we must address the argument that this action is preempted under federal law.[2] Appellees contend that this state law tort action is preempted by regulations promulgated pursuant to the Federal Consumer Products Safety Act, 15 U.S.C. §§ 2053, et seq. ("CPSA"). The CPSA authorized the Consumer Product Safety Commission (the "Commission") to promulgate safety standards for consumer products. Pursuant to that authority, the Commission issued regulations pertaining to disposable butane lighters. Those regulations required manufacturers to implement child-resistant features for all disposable butane lighters manufactured or imported after July 12, 1994, and outlined procedures for stockpiling lighters manufactured after 1990 and before that date. 16 C.F.R. §§ 1210.1 et seq.

¶ 6 Appellees suggest that this action is preempted for the following reason:

If this suit is permitted to go forward, there would be an actual conflict with the federal objectives embodied in 16 C.F.R. § 1210, et seq. The requirement of child-resistant features on all lighters, regardless of their date of manufacture or importation, would present an obstacle to the variety and mix of devices that the commission would allow. It would require implementation of child-resistant features even though the commission allowed for stockpiling within certain parameters. As such, any state law suit that would be premised upon mandatory child-resistance features would pose an actual conflict and be pre-empted.

Supplemental Brief for Appellees at 12.[3]

¶ 7 Appellees contend that *Geier v. American Honda Motor Co.*, 529 U.S. 861, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000), is controlling. In that case, Alexis Geier was injured when her 1987 Honda Accord struck a tree. The car was equipped with one passive restraint system, which was a shoulder and lap seat belts. It was not equipped with safety air bags, which are another type of passive restraint system, and Ms. Geier and her parents instituted an action raising the claim, among others, that the car was defective because it did not have an air bag.

¶ 8 The Supreme Court in *Geier* concluded that the Federal Motor Vehicle Safety Standard Act ("MVSS") preempted such a claim because the claim actually conflicted with a federal scheme promulgated pursuant to the MVSS. The federal regulatory scheme allowed manufacturers

1. There are four *amicus curiae* briefs filed on appeal. BIC Corporation and The Product Liability Advisory Council, Inc. filed briefs in support of Appellees' position. The Pennsylvania Trial Lawyers Association and certain plaintiffs in a similar action in the federal courts of Pennsylvania filed briefs in support of Appellant's position.

2. At oral argument, the panel requested supplemental briefs on the question of federal preemption. Appellant argues that the argument is waived due to Appellees' failure to present it to the trial court. However, the preemption issue relates to our jurisdiction, a non-waivable inquiry. Furthermore, we are permitted to affirm the trial court on any legal ground, even if it is different from the basis utilized by the trial court. *Al Hamilton Contracting Co. v. Cowder*, 434 Pa.Super. 491, 644 A.2d 188 (1994); *see also Renee Beauty Salons v. Blose Venable*, 438 Pa.Super. 601, 652 A.2d 1345 (1995) (if a trial court has reached the correct result, its order will be sustained if it can be sustained for any reason). Therefore, if dismissal of this action is the proper result, we could affirm whether dismissal is based on federal preemption or on application of Pennsylvania tort law.

3. Appellees do not argue that this lawsuit is expressly preempted by the CPSA.

to *choose* among various passive restraint alternatives for cars manufactured in 1987. Significantly, the car at issue was in compliance with the federal standard since it had one of the passive restraint systems in the car, lap and seat belts. The Supreme Court concluded that the state tort action at issue conflicted directly with the federal standard, which allowed manufacturers to choose among the passive restraint alternatives. The Supreme Court noted that by forcing the manufacturers to comply with a safety standard they expressly did not have to comply with due to compliance with another standard, the state tort action conflicted directly with the federal scheme of allowing for choice among the safety features.

¶ 9 Initially, we note in *Geier,* the Court reaffirmed the principle that state laws and federal regulations on the same subject may apply where the state law is not in conflict with, and may be construed consistently with, federal regulations. Thus, under that case and other applicable Supreme Court cases, state law is impliedly preempted only when it *directly* conflicts with federal law by being an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

¶ 10 We also observe that the facts in *Geier* are vastly different from those herein. The elementary problems with Appellees' preemption argument include first, that the lighter standard at issue, 16 C.F.R. § 1210.1 *et seq., does not apply* to the lighter that caused the fire that killed or injured Appellant's decedents and minor. Second, the lighter at issue *did not comply* with the standard. In *Geier,* the regulation at issue was enacted in 1984, and it was undisputed that the standard was in force at the time that the *Geier* vehicle was manufactured. Therefore, it is

obvious that the standard was intended to apply to the vehicle. Further, the automobile manufacturer was in compliance with the standard, as it had adopted one safety feature, and it was required to adopt only one.

¶ 11 The federal law that Appellees contend pre-empts this action is regulation 16 C.F.R. § 1210.3, which essentially requires a disposable butane lighter to be equipped with a mechanism that resets itself automatically after each operation and prevented eighty-five percent of the children in a test panel from igniting the lighter. The regulation was enacted on July 12, 1993, and had a later effective date of July 12, 1994. 16 C.F.R. § 1210.1.

¶ 12 The lighter at issue was manufactured in the year 1990. Further, it would have been sold at retail within several months after it was manufactured. Additionally, it is undisputed that the fire that caused the deaths and injuries in this case occurred in November 1993, but 16 C.F.R. § 1210 was not federal law until July 12, 1994. Therefore, the standard does not even apply to the lighter involved in this case, which means that there is no federal standard attempting to regulate the same subject matter as that of Appellant's claims. Second, the lighter involved in this case does even not meet the requirements of 16 C.F.R. § 1210.3, as the regulation requires the lighter contain certain child safety features. It is not disputed by Appellees in this appeal that the lighter at issue had no such features.

¶ 13 Appellees suggest that since the regulations apply only to lighters either manufactured or imported after the effective date of the regulation, the Commission must have intended to give all lighter manufacturers immunity for all defectively designed lighters manufactured prior to the date of the effective date. This position is

absurd as there is no indication of this intent anywhere in the regulation.

¶ 14 Moreover, the *Geier* court found that the FMVSA standard was intended to give manufacturers an option of several different choices: one of the choices was to have airbags; another was to have the passive restraint system actually used by the *Geier* defendant. The court found that it was the Department of Transportation's objective to give an automobile manufacturer a range of choices among different passive restraint systems that would be gradually introduced because there were concerns: (1) about costs of implementing airbags; (2) that the airbag system needed more technological development for safety concerns; and (3) consumers would not accept the airbag. Therefore, the Department of Transportation wanted to allow manufacturers to use a mix of different devices, including airbags, automatic belts, or other passive restraint technologies, that would be introduced gradually over time. Finally, the Department of Transportation had specifically rejected a proposed all-airbag standard.

¶ 15 However, no such similar intent can be found in the regulations involved in this case. In 16 C.F.R. § 1210.5, the Commission stated its findings as it is required to do under federal law. There was no intent to give lighter manufacturers a choice of options.

¶ 16 Appellees suggest that there was such a choice by characterizing the lighter in the instant case as a "stockpiled lighter." However, it is clear that under the standard, the lighter involved in this case was not a stockpiled lighter. Stockpiled lighters under the regulation were lighters that were manufactured or imported that

were subject to the safety rule between July 12, 1993, and July 12, 1994. Lastly, Appellees incorrectly state that the Commission adopted a piecemeal approach to the subject. Although the Commission did delay enactment of the standard for one year, it clearly was not concerned that the changes were too swift or too drastic a change for manufacturers. It stated in its findings that "the amount of time before the standard becomes effective will provide manufacturers and importers of most products adequate time to design, produce, and market safer lighters ." 16 C.F.R. § 1210.5(e). Additionally, it stated:

> [w]hile most lighters sold in the U.S. could probably be made child resistant within 6 months, some disruptive effects on the supply of some imported lighters would result; this could have a temporary adverse impact on the competitive positions of some U.S. importers. The 12–month period in the standard would tend to minimize this potential effect, and would allow more time for firms to design, produce, and import complying lighters. The Commission estimates that there would be no significant adverse impact on the overall supply of lighters for the U.S. market.

16 C.F.R. § 1210.5(g)(5). Thus, the allowance of stockpiling reflects a trade rather than safety concern.

¶ 17 Even if *Geier* were not distinguishable based on the fact that this action does not conflict with the federal regulatory scheme, we would find that this action is not preempted because the statutory structure of the CPSA is different from that of the MVSA. The saving clause in the MVSA that was considered by the *Geier* court reads: [4] "Compliance with any federal motor vehicle safety standard issued

---

4. A savings clause indicates the types of state law claims that survive the federal intervention in the area.

under this subchapter does not exempt any person from liability under common law." 15 U.S.C. § 1397(k). The *Geier* Court undertook a lengthy analysis of the savings provision of the MVSA to conclude that it does not forbid implied preemption when there is *actual conflict.* The court stated:

> We now conclude that the saving clause (like the express pre-emption provision) does not bar the ordinary working of conflict pre-emption principles.
>
> *Nothing in the language of the saving clause suggests an intent to save state-law tort actions that conflict with federal regulations.* The words "[c]ompliance" and "does not exempt," 15 U.S.C. § 1397(k) (1988 ed.), sound as if they simply bar a special kind of defense, namely, a defense that compliance with a federal standard automatically exempts a defendant from state law, whether the Federal Government meant that standard to be an absolute requirement or only a minimum one.

*Geier, supra.*

 ¶ 18 In the present case, the CPSA's provisions do suggest an intent to save state-law tort actions that conflict with federal regulations. Although the CPSA has a similar savings clause to the MVSA,[5] that savings clause is not the only provision of the CPSA that addresses the allowance of state court lawsuits. Specifically, 15 U.S.C. § 2075(b) (emphasis added), entitled "Consumer product safety requirements which impose performance standards more stringent than Federal standards," states:

> [s]ubsection (a)[6] of this section does not prevent ... the government of any ... State ... from establishing or continuing in effect a safety requirement applicable to a consumer product ... designed to protect against a risk of injury associated with the product and which is not identical to the consumer product safety standard applicable to the product under this Act *if the ... State ... requirement provides a higher degree of protection from such risk of injury than the standard applicable under this Act.*

¶ 19 Thus, the CSPA allows states to set higher, but not lower, safety standards. In the instant case, it is undisputed that the state tort law provides a higher degree of protection than the regulation because there was no regulation in effect when the lighter was manufactured. Accordingly, we reject Appellees' federal-preemption argument.

¶ 20 We now address whether the trial court properly granted summary judgment based on its conclusion that the minor child was not an intended user of the

---

5. The savings clause of the CPSA, 15 U.S.C. § 2074(a), in a section entitled "Private Remedies: Liability at common law or under State statute not relieved by compliance," states that: "Compliance with consumer product safety rules or other rules or orders under this act shall not relieve any person from liability at common law or under State statutory law to any other person."

6. 15 U.S.C. § 2075(a) states:
 **State compliance to Federal Standards.** Whenever a consumer product safety standard under this Act is in effect and applies to a risk of injury associated with a consumer product, no State or political subdivision of a State shall have any authority either to establish or to continue in effect any provision of a safety standard or regulation which prescribes any requirements as to the performance, composition, contents, design, finish, construction, packaging, or labeling of such product which are designed to deal with the same risk of injury associated with such consumer product, unless such requirements are identical to the requirements of the Federal standard.

butane lighter.[7] In making her claim under § 402A of the Restatement (Second) of Torts, Appellant alleges that the lighter in question was defective because it was not equipped with childproof or child-resistant features.

¶ 21 In *Webb v. Zern*, 422 Pa. 424, 427, 220 A.2d 853, 854 (1966), the Pennsylvania Supreme Court adopted § 402A of the Restatement (Second) of Torts as the law of this Commonwealth. That section provides:

1) One who sells any product in a defective condition unreasonably dangerous to *the user or consumer* or to his property is subject to liability for physical harm thereby caused to *the ultimate user or consumer,* or to his property, if
 1. the seller is engaged in the business of selling such a product, and
 2. it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
2) The rule stated in Subsection (1) applies although
 1. the seller has exercised all possible care in the preparation and sale of his product, and
 2. the user or consumer has not bought the product *from or entered into any contractual relation with the seller.*

Restatement (Second) of Torts § 402A (emphases added).

¶ 22 There are three elements in products liability action: 1) the product must be defective; 2) the defect must be a substantial factor in causing plaintiff's in-juries; and 3) the defect must exist at the time the product left defendant's control. *Berkebile v. Brantly Helicopter Corporation,* 462 Pa. 83, 337 A.2d 893 (1975).

¶ 23 A defect can be shown in one of two ways. First, a plaintiff can prove a defect if the machine or one of its components had a breakdown, which is known as a manufacturing defect. Second, a plaintiff can state a cause of action under § 402A by demonstrating that the design of the machine resulted in an unreasonably dangerous product, which is known as a design defect. *Riley v. Warren Manufacturing, Inc.,* 455 Pa.Super. 384, 688 A.2d 221 (1997). Appellant's action is premised upon a design defect since the lighter did operate properly and did not break down. Appellant alleges that it was designed defectively as it was unreasonably dangerous to fail to place childproof or child-resistant features on the product.

¶ 24 In the present case, the trial court granted summary judgment against Appellant based on its conclusion that the product was not defective for failing to contain child resistant features as a matter of law since a child is not an "intended user" of a disposable butane lighter.

¶ 25 Meanwhile, there are three elements, as stated above, in a products liability action. None of those elements requires the product to be used by an "intended user." The trial court's decision rested on two bases. First, the court applied language in *Azzarello v. Black Brothers Co.,* 480 Pa. 547, 391 A.2d 1020, 1027 (1978) (emphases added), providing that a design defect will be found where: "1) the product left the supplier's control lacking

---

**7.** We note that Appellant has not argued that summary judgment was granted improperly as to her inadequate-warnings products liability claim. She also does not argue that the court improperly granted summary judgment to Appellees on her causes of action sounding in battery and intentional infliction of emotional distress. Hence, we will affirm the grant of summary judgment as to those three claims.

any element necessary to make it safe for its *intended use* or 2) possessing any feature that renders it unsafe for the *intended use* ." The trial court concluded that the term "intended use" necessarily entails the requirement that the user be an "intended user." The court also read the case of *Riley, supra,* as requiring a user to be an "intended user" before liability will be imposed.

¶ 26 We disagree with this analysis and believe that it harkens back to privity principles that were expressly abrogated by the adoption of products liability law. Initially, as noted, there is nothing in the elements of a products liability cause of action that requires a plaintiff to be an "intended user" of a product. Instead, the language of Restatement (Second) of Torts § 402A allows recovery to any *ultimate* user or consumer of the defective product.

¶ 27 The term user and consumer is explained:

*l. User or consumer.* In order for the rule stated in this Section to apply, it is not necessary that the ultimate user or consumer have acquired the product directly from the seller, although the rule applies equally if he does so. He may have acquired it through one or more intermediate dealers. It is not even necessary that the consumer have purchased the product at all. *He may be a member of the family of the final purchaser,* or his employee, or a guest at his table, or a mere donee from the purchaser. The liability stated is one in tort, and does not require any contractual relation, or privity of contract, between the plaintiff and the defendant.

. . . .

Consumption includes all *ultimate uses for which the product is intended,* and the customer in a beauty shop to whose hair a permanent wave solution is applied by the shop is a consumer. "User"

includes those who are passively enjoying the benefit of the product, as in the case of passengers in automobiles or airplanes, as well as those who are utilizing it for the purpose of doing work upon it, as in the case of an employee of the ultimate buyer who is making repairs upon the automobile which he has purchased.

**Illustration:**

1. A manufactures and packs a can of beans, which he sells to B, a wholesaler. B sells the beans to C, a jobber, who resells it to D, a retail grocer. E buys the can of beans from D, and *gives it to F. F serves the beans at lunch to G, his guest.* While eating the beans, G breaks a tooth, on a pebble of the size, shape, and color of a bean, which no reasonable inspection could possibly have discovered. There is satisfactory evidence that the pebble was in the can of beans when it was opened. Although there is no negligence on the part of A, B, C, or D, *each of them is subject to liability to G.* On the other hand E and F, who have not sold the beans, are not liable to G in the absence of some negligence on their part.

. . . .

*o. Injuries to non-users and non-consumers.* Thus far the courts, in applying the rule stated in this Section, have not gone beyond allowing recovery to users and consumers, as those terms are defined in Comment *l. Casual bystanders,* and others who may come in contact with the product, as in the case of employees of the retailer, or a *passerby* injured by an exploding bottle, or a pedestrian hit by an automobile, have been denied recovery. There may be no essential reason why such plaintiffs should not be brought within the scope of the protection afforded, other than

that they do not have the same reasons for expecting such protection as the consumer who buys a marketed product; but the social pressure which has been largely responsible for the development of the rule stated has been a consumers' pressure, and there is not the same demand for the protection of casual strangers. The Institute expresses neither approval nor disapproval of expansion of the rule to permit recovery by such persons.

Restatement (Second) of Torts § 402A, comments l, o (emphases added).

¶ 28 In *Riley*, the language of comments l and o was applied to determine whether a child who used a sophisticated piece of farm equipment in a way that it was *not intended to be used* could recover. Specifically, a piece of farm machinery operated by the plaintiff's grandfather and used on his farm had a blade that rotated and was accessible by placing one's hand into a discharge tube. In that case, the plaintiff was injured when he placed his hand into the discharge tube. The plaintiff's expert witness opined that the machinery was unsafe because the blades were accessible to anyone who placed his hand into the discharge tube. Moreover, the opening to the tube was unguarded. However, that expert witness "conceded that there was *no reason* to put a hand inside the discharge tube." *Id.* at 225 (emphasis added).

¶ 29 The expert witness also had various design options that he contended could have prevented someone from coming into contact with the blade. However, the expert witness "did not conduct any tests or show any blueprints, to determine whether any of his suggestions were feasible or cost efficient." *Id.* at 226. In fact, he admitted that some of his suggestions were impractical.

¶ 30 In *Riley*, we examined whether the plaintiff was a user or consumer under the Restatement and concluded that he was not, based on the fact that he was a "reasonably obvious unintended user." We stated:

The trailer was a sophisticated piece of industrial machinery, to be used by an educated group of industrial consumers. Its normal and intended use was to be by the trained employees of AgCom who were responsible for hauling the bulk feed to farms. All the expert witnesses agreed, including appellants' expert, that the trailer *was not intended to be used by or around children.*

Thus, the trial court correctly concluded that AgCom and its employees, as the consumers and operators of the product, were the "users" who were afforded protection under § 402A. Because a child was never the intended consumer of the product *and had no reason to come in contact with it,* Coby was clearly an "obvious unintended user." Consequently, § 402A relief was not available to him.

*Id.* at 229 (emphases added).

¶ 31 Conversely, a butane lighter is not sophisticated, it is not an industrial machine, and it is not to be used only by educated, trained industrial users. Lighters are distributed to households everywhere. Thus, lighters are *intended to be used around children and children have reason to come into contact with them.* It is *not reasonably obvious* that a child would not use the product as a member of a purchaser's family. Indeed, this case illustrates that a purchaser can be careful in attempting to avoid contact by children and yet the child will come into contact with the lighter. Robyn had placed the lighter in her purse on top of her refrigerator. Thus, we cannot equate the user in *Riley* to the user in this case; indeed, the

language in *Riley* actually *supports* Appellant's position in this case since it suggests that if the product is to be used in a household around children and children have reason to come into contact with the product, children will be a user or consumer of the product under the Restatement.

¶ 32 Moreover, nothing in the language of *Azzarello* requires a user to be someone who the manufacturer "intends" to use the product in order for that manufacturer to be liable for manufacturing a defective product. If such a position were accepted, manufacturers could limit recovery only to a purchaser, who arguably is the only "intended user" of a product. These antiquated concepts were abolished by the adoption of Section 402A. In addition, intended use is not the equivalent of intended user. In *Riley*, no one was supposed to place their hand in the discharge tube. The use was not intended. Here, the lighter was used as intended-it created a flame. Thus, *who* uses a product and *how* it is used are not the same concept. While those concepts are intertwined, they are not identical.

¶ 33 Finally, in *Riley*, our decision to uphold the grant of compulsory nonsuit against the plaintiff did not rest solely on the fact that the plaintiff was a "reasonably obvious unintended user" of the product. Instead, it rested upon the existence of all of the following factors:

> Here the benefits of the trailer were clear, no feasible alternatives were shown to exist, the trailer was not defective, and there was no evidence that a risk of injury existed for intended users using the machine for its intended use.

8. The trial court also relied upon the third circuit court of appeals decision in *Griggs v. BIC Corp.*, 981 F.2d 1429 (3rd Cir.1992), which adopted the position employed by the trial court herein. *Griggs* was decided before

Hence, the trial court did not err in directing the verdict in favor of appellee. *Id.* at 230.

¶ 34 In this case, this product was held to be not defective as a matter of law based *solely* on the fact that children are not intended users of lighters.[8] The trial court did not employ the risk-utility test required under Pennsylvania law.

¶ 35 We now examine the applicable law. The threshold determination of whether a product's condition justifies placing the risk of loss on the supplier is a threshold question of law for the court to determine. *Azzarello, supra.* This threshold question is a social policy determination. *Id.* This threshold determination is to be made by performing a risk-utility analysis, and the multi-factor list developed by Dean John Wade of Vanderbilt University in his article "On the Nature of Strict Tort Liability for Products," 44 Miss.L.J. 825, 837–38 (1973), should be employed. *Dambacher by Dambacher v. Mallis*, 336 Pa.Super. 22, 485 A.2d 408 (1984).

¶ 36 The following factors are to be considered in making this determination:

> [T]he gravity of the danger posed by the challenged design; the likelihood that such danger would occur; the mechanical feasibility of a safer design; and the adverse consequences to the product and to the consumer that would result from a safer design.
>
> .... [These] additional factors, [also are to be considered:]
>
> > (1) The usefulness and desirability of the product-its utility to the user and to the public as a whole.

*Riley* and does not employ the proper standards in light of post 1992 developments in products liability law in Pennsylvania. *See Surace v. Caterpillar, Inc.*, 111 F.3d 1039, 1046 n. 6 (3rd Cir.1997).

(2) The safety aspects of a product-the likelihood that it will cause injury, and the probable seriousness of the injury.

(3) The availability of a substitute product which would meet the same need and not be as unsafe.

(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

(5) The user's ability to avoid danger by the exercise of care in the use of the product.

(6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

(7) The feasibility on the part of the manufacturer, of spreading the loss of setting the price of the product or carrying liability insurance.

*Riley, supra,* 688 A.2d at 225 (quoting and citing *Dambacher, supra* ).

¶ 37 In response to Appellees' motion for summary judgment, Appellant filed an expert witness report prepared by John O. Geremia, Ph.D., who is currently professor emeritus, Mechanical Engineering Department, of the United States Naval Academy. That report indicates the following. Dr. Geremia has consulted extensively in the area of design and safety of disposable butane lighters. Designers, manufacturers, and distributors of Cricket disposable butane lighters have "been well aware, since at least the early 1970's, that there was a potential significant serious hazard of catastrophic injury and death, particularly to the young, as a result of children utilizing or playing with disposable butane cigarette lighters." Plaintiff's Response to Motion for Summary Judgment, Expert Report, 9/25/97, at 3. In fact, Dr. Geremia was involved in preparing and disseminating a 1973 report to the cigarette lighter industry that discussed the hazards.

¶ 38 The Consumer Product Safety Commission did a study of fire hazards involving children playing with cigarette lighters, and the results were published in September 1987. That study indicated that during 1980–85, an average of 170 people a year died in cigarette lighter fires and of those 170, 120 died in fires started by children playing with cigarette lighters. Most of those victims were young children. In addition, at least 750 people per year were injured from fires caused by children playing with cigarette lighters. The annual cost of child-play lighter fires during that time was $300–375 million dollars, or sixty to seventy-five cents per lighter sold.

¶ 39 Disposable butane lighters were involved in ninety-six percent of the fires in which the type of lighter was known. Dr. Geremia also opined that while lighters may not be intended for children, a lighter is an attractive product for children since it produces a flame and since children are naturally curious about fire.

¶ 40 Finally, Dr. Geremia rendered the opinion that "for many years prior to the time of the manufacture of the subject Cricket lighter, it was technologically, commercially and economically feasible to manufacture and distribute a reasonably designed child-resistant lighter." *Id.* at 11. He stated that the manufacture and distribution of a child-resistant lighter would have entailed "only a nominal additional cost." *Id.*

¶ 41 We now apply the risk-utility analysis in light of this expert report. The product is useful and desirable, and the adult-purchaser was warned of the risk involved. The purchaser in this case can

attempt to avoid the danger. On the other hand, Appellees were aware of the problem—a substantial risk of the worst injury, death—years before this product was manufactured. The risk was increased by the fact that children have a natural curiosity about fire and desire to play with the product. Finally, Appellees had the ability to use a substitute product that created fire but substantially reduced the risk involved. The substitute product involved nominal cost that could have been spread easily to the consumer by increasing the price of the product.

¶ 42 Thus, the danger posed by the design was of the gravest kind and, the likelihood that the danger would occur, due to the nature of children and the product involved, was substantial and known to the Appellees years prior to manufacture of this product. The adverse consequences to the product and to the consumer that would result from a safer design were minimal—a nominal increase in cost. Based on this analysis and using the risk-utility test required by *Azzarello* and its progeny, we conclude that summary judgment should not have been granted to Appellees.

¶ 43 Our research on whether manufacturers of disposable butane lighters have been held liable under products liability law for fires started by children using lighters that do not have child-resistant or child-proof features unquestionably reveals a division of opinion on the subject. Wozniak, Products Liability: Lighters and Lighter Fluid, 14 A.L.R. 5th 47 (2000). There are cases concluding that manufacturers of disposable butane lighters are not liable for fires caused by children based on the fact that lighters do not contain child-proof or child-resistant features. *Jennings v. BIC Corp.*, 181 F.3d 1250 (11th Cir.1999) (under Florida law, manufacturers of disposable butane light-ers are not liable in strict liability or negligence for fires started by children); *Todd v. Societe Bic, S.A.*, 21 F.3d 1402 (7th Cir.1994) (under Illinois law, risk-utility test is not applied to a simple and obviously dangerous product, such as a disposable lighter, and such a lighter is obviously but not unreasonably dangerous); *Kirk v. Hanes Corp.*, 16 F.3d 705 (6th Cir.1994) (risk-utility test not applicable under Michigan law—parents are responsible for children's use of simple tools that have obvious dangers where those tools are marketed only to adults); *Floyd v. BIC Corp.*, 790 F.Supp. 276 (N.D.Ga.1992) (manufacturers of disposable butane lighters owe no duty to child-proof lighters under Georgia law); *Adams v. Perry Furniture Co.*, 198 Mich.App. 1, 497 N.W.2d 514 (1993), *overruled on different grounds, Allied Electric Supply Co. v. Tenaglia*, 461 Mich. 285, 602 N.W.2d 572 (1999) (same result under Michigan law).

¶ 44 However, we find more persuasive the line of cases holding to the contrary, especially since those cases usually have employed a risk-utility test more closely aligned to Pennsylvania law. *Bartholic v. Scripto–Tokai Corp*, 2000 U.S.Dist.LEXIS 18634 (applied Colorado law, which uses a risk-utility analysis; summary judgment was not granted to manufacturers of disposable butane lighters; jury question presented as to whether lighter was defective for failing to contain child resistant features); *Perkins v. Wilkinson Sword, Inc.*, 83 Ohio St.3d 507, 700 N.E.2d 1247 (1998) (rejected that no duty was present because children are not intended users of butane lighters; risk-benefit test of Ohio products liability law used to attempt to establish design defect in properly functioning disposable cigarette lighter; liability not precluded for harm caused by the foreseeable use of a lighter by a child); *Price v. BIC Corp.*, 142 N.H. 386, 702 A.2d 330 (1997) (defective design product liability claim

against manufacturer can proceed even though product was intended to be used only by adults since risk that children might misuse product was open and obvious to manufacturer; risk-benefits analysis employed; case proceeded on allegation that lighter was defectively designed in that it lacked child resistant features). There are additional cases where summary judgment was not granted to manufacturers of disposable butane lighters in cases where children used non-child resistant lighters to start fires. *Bean v. BIC Corp.*, 597 So.2d 1350 (Ala.1992); *Campbell v. BIC Corp.*, 154 Misc.2d 976, 586 N.Y.S.2d 871 (N.Y.Sup.Ct.1992); *Hernandez v. Tokai Corp.*, 2 S.W.3d 251 (Tex.1999).

¶ 45 In the present case, the trial court dismissed Appellant's negligence claim and her negligent-infliction-of-emotional-distress claim based on the fact that the product was not defectively designed since it was not used by an intended user. Since we have reversed the trial court's conclusion that the product was not defectively designed on that basis, we reverse its decision to grant summary judgment as to those two negligence claims. Similarly, since we have concluded that Appellant has viable causes of action, and the punitive damages claim was dismissed on the ground that Appellant did not, we must reverse dismissal of the punitive damages claim.

¶ 46 The summary judgment is affirmed in so far as it dismisses the causes of action against Appellees sounding in battery, intentional infliction of emotional distress, and inadequate-warnings products liability. The summary judgment is reversed to the extent that it dismissed causes of action sounding in design-defect products liability, negligence, negligent infliction of emotional distress, breach of warranty, and punitive damages. The application of amicus curiae Shirley and John

Hittle for permission to file supplemental authority in support of brief is granted. Case remanded. Jurisdiction relinquished.